IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANNETTE GOBLE,

                          Plaintiff,                     OPINION AND ORDER

       v.

                                                     08-cv-529-bbc

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is an action for judicial review of an adverse decision of the commissioner of Social Security brought under 42 U.S.C. § 405(g).  Plaintiff Annette Goble seeks reversal of the commissioner's decision that she is not disabled or eligible for Disability Insurance Benefits or Supplemental Security Income under Title II and Title XVI of the Social Security Act, codified at 42 U.S.C. §§ 416(i), 423(d) and 1382(c)(3)(A).  Plaintiff contends that the the administrative law judge's denial of her claim is not supported by substantial evidence because the administrative law judge erred in assessing her credibility, did not properly weigh and consider the evidence in determining her residual functional capacity and did not make a proper step five determination.

1

I conclude that the administrative law judge made a proper assessment of plaintiff's credibility.  Although two of plaintiff's treating physicians thought she was unemployable, their conclusions were not based on any medical findings but on plaintiff's self-reporting of her pain, mental condition and physical capabilities.  The administrative law judge did not find plaintiff's reports accurate for reasons that she explained and which are supported by the record.  She did not err in making either the residual functional capacity finding or the step five determination.  Accordingly, I am denying plaintiff's motion for summary judgment and affirming the administrative law judge's decision.

The following facts are drawn from the administrative record (AR):

## FACTS

### A.  <u>Background and Procedural History</u>

Plaintiff was born on August 18, 1958.  AR 66.  She graduated from high school,  AR 76, and was licensed in practical nursing in 1988.  AR 76.  Her past relevant work includes work as a licensed practical nurse, teacher's assistant and pharmacy technician.  AR 70-86.

Plaintiff first applied for Social Security Disability Benefits and Supplemental Security Income on November 15, 2004, alleging that she was disabled as of that date by fibromyalgia, chronic fatigue, herniated discs and migraines.  AR 37.  In a January 2, 2005 functional report, she stated that she could not life more than 20 pounds, AR 92, but that

2

she was able to wash dishes, make beds, do laundry, tidy her house, take short shopping trips, go boating and have lunch or coffee with friends.  AR 89, 91.

After the local disability agency denied her application initially and upon reconsideration, plaintiff requested a hearing, which was held on May 30, 2007 before Administrative Law Judge Mary M. Kunz.  The administrative law judge heard testimony from plaintiff, plaintiff's husband, a neutral medical expert and a neutral vocational expert. AR 439-83.  On July 27, 2007, the administrative law judge issued her decision, finding plaintiff not disabled from November 15, 2004 to the date of her decision.  AR 13-26.  That decision became the final decision of the commissioner when the Appeals Council denied plaintiff's request for review on May 16, 2008.  AR 5-8.

## B.  Treating Physicians

### 1. Dr. Edrie Kioski

On July 29, 2003, before the alleged onset date of her disability, November 15, 2004, plaintiff saw Dr. Edrie Kioski at the United Pain Center.  Edrie Kioski diagnosed

- cervical disc disease and radiculitis symptoms in the right arm,
- a thoracic herniated disc
- fibromyalgia and
- migraine headaches

Kioski noted that plaintiff's 2002 scan results were significantly more benign than her 2000 computed topography scan and magnetic resonance imaging results, which had shown moderate to advanced disc degeneration at C6-7; mild to moderate disc degeneration at C3-4, C4-5 and C5-6; and severe foraminal stenosis on the right side.  An electromyogram of plaintiff's right upper extremity was normal.   Koski told plaintiff that it might be premature to be thinking about disability because she might be a surgical candidate and he noted that she had had epidural steroid injections in the past that had not been helpful.  AR 239.

### 2. Dr. Joseph Perra

On August 15, 2003, plaintiff saw Dr. Joseph Perra at the Spine Center and reported that her grip strength was decreasing, causing her to drop things.  Perra told plaintiff that she had degenerative disc disease and that surgery might not be the right option for her because many of her discs had worn out.  He noted that plaintiff had tried physical therapy and that she had few remaining treatment options.  After examining plaintiff, Perra found her upper extremity strength to be normal.  AR 253.

### 3. Dr. Dale Hadland

On November 4, 2005, plaintiff saw Dr. Dale Hadland.  She told him that she had continuing chronic pain secondary to multilevel degenerative disc disease; degenerative

4

arthritis; fibromyalgia and sleep disturbance and that she was taking Skelaxin, methadone, Allegra and Ambien.  Plaintiff told Hadland that she tried to get as much exercise as possible.

From his examination of plaintiff, Hadland found that she had decreased range of motion in her neck and that her back was tender with multiple trigger points.  He prescribed Cymbalta. AR 332-33.

On January 7, 2005, plaintiff saw Hadland again, reporting that she was still experiencing musculoskeletal pain consistent with fibromyalgia but had that she had improved on Cymbalta. AR 330.  Hadland increased the dosage.

In February 2005, plaintiff reported to Hadland that she had improved mood and possibly less pain on the increased dosage of Cymbalta.  AR 329.

In April 2005, plaintiff told Hadland that the Cymbalta had no apparent effect on her pain and that she was feeling over-medicated.  Hadland took her off Cymbalta and continued her on methadone, noting that her pain and pain tolerance were stable.  AR 327.

In May 2005, plaintiff told Hadland that she had increasing muscle tightness and pain, that she was having more migraine headaches and that she was having trouble sleeping. She said that the methadone and Ambien were not working, but she asked for refills.  On examination, Hadland noted that plaintiff's muscles were very tight and tender diffusely, although her right arm appeared to be more affected than her left arm or legs.  He noted that

plaintiff's fibromyalgia was worse and prescribed a prednisone taper and Axert for her migraines.  AR 326.

Plaintiff reported continuing difficulties to Hadland on July 13, 2004.   He discontinued plaintiff's Ambien, started her on Lunesta and continued her on methadone.  AR 325.

On September 28, 2005, plaintiff saw Dr. Hadland and reported doing well.  She said she might be willing to go off the methadone in the future.  AR 324.

In February 2006, plaintiff complained to Dr. Hadland that her pain had increased throughout the winter and she had continuing sleep disturbances.  Although Hadland found on examination that plaintiff was stiff and had very tender trigger points, he concluded that her fibromyalgia was stable and continued her on methadone.  AR 360.

On August 14, 2006, Dr. Hadland wrote a letter stating:

> I believe the patient is unemployable.  She is unable to sit, stand, bend, and/or really function mentally in any type of employment situation secondary to her chronic pain syndrome and muscle tightness/pain associated with the fibromyalgia.

AR 359.

In September 2006, plaintiff complained to Hadland that her pain and flexibility had worsened since she had run out of her methadone and Skelaxin a month earlier.  AR 358. Hadland found that plaintiff had no withdrawal symptoms and multiple trigger points in her

lower cervical, parascapular and lumbar regions, but that these points had remained essentially unchanged over the period he had known her.  He concluded that her fibromyalgia was stable.  He refilled her methadone, Skelaxin and Ambien.  AR 358.

### 4. Dr. Tom Holbrook

Between January and June of 2005, plaintiff received chiropractic treatments from Dr. Tom Holbrook, who performed adjustments and applied heat therapy.  He also suggested vitamin supplements and exercise such as yoga, pilates or deep water exercise.  Over the course of her treatment with Holbrook, plaintiff reported fairly high pain levels (between 7 and 10) and exhibited reduced or limited range of motion in her cervical and lumbar spine, muscle spasms and tenderness.  AR 256-61.

### 5. Dr. Robert J. Tierney

On August 29, 2005, plaintiff saw rheumatologist Robert J. Tierney, a doctor whom she had seen in 1998 for diffuse musculoskeletal pain plus fibromyalgia.  AR 353.  Plaintiff told Tierney that she had been evaluated at the pain clinic and was taking methadone, Skelaxin and Ambien without much relief.  On examination, Tierney noted that plaintiff had

- "give way" weakness in the right arm and leg
- normal strength
- tenderness in her back

- normal reflexes, motor and sensory exams
- degenerative disc disease and osteoarthritis at plaintiff's thoracic, lumbar and cervical spine (as shown on magnetic resonance imaging scans)
- normal lab tests and bone scan

Tierney wrote that plaintiff's pain was "certainly not compatible with lesions at those sites [thoracic, lumbar and cervical spine] and I think are unrelated."  AR 354.  Tierney recommended that plaintiff stop methadone, Skelaxin and Ambien because she told him she thought they were not effective.  Tierney suggested that plaintiff work with the pain clinic or Dr. Hadland to manage her pain and anxiety.  AR 354.


6. <u>Dr. Okechukwu N. Iwu</u>

When plaintiff began seeing Dr. Okechukwu N. Iwu on October 31, 2006, the doctor noted that she had

- severe fibromyalgia,
- fairly significant degenerative joint disease of the cervical, thoracic and lumbar spine
-  inability to sleep
- mild major depression

Plaintiff reported that her pain was a seven on a zero to ten scale.  Iwu wrote that she appeared well with no apparent distress and was alert, oriented times three, pleasant and cooperative.  Iwu thought that plaintiff's fibromyalgia had not been fully assessed and he contemplated looking into other treatment modalities.  AR 389.

8

On January 3, 2007, Iwu noted that plaintiff's pain control had been pretty stable but that she still experienced insomnia.  He wrote that she was pleasant, well, in no apparent distress and oriented times three.  AR 378.  Iwu increased her methadone and Ambien.  AR 378-79.

On January 31, 2007, plaintiff told Iwu that she had more pain, which she rated at a nine on a zero to ten scale.  He noted that she had moderate major depression but appeared well and in no apparent distress and was alert, oriented times three, pleasant and cooperative.  Responding to plaintiff's reports of increased pain and depression, Iwu wrote that he would have to be more aggressive.  He increased plaintiff's methadone dosage and referred her to a fibromyalgia clinic.  AR 376.

On April 24, 2007, Dr. Iwu wrote to plaintiff's lawyer, saying that plaintiff was under his care "for chronic pain syndrome, primarily due to fibromyalgia, which is fairly crippling." AR 269.  Iwu said that plaintiff was unable to sit or stand for five to ten minutes without making her pain worse; she needed assistance with activities of daily living that required arm extension; and her husband did all the housework.  It was his belief that plaintiff could not engage in substantial gainful activity for more than 12 months.  AR 369.

7. Nurse Peggy Stevens

On November 30, 2006, plaintiff saw Nurse Peggy Stevens for a medication refill. On examination, Stevens noted that plaintiff had

- depressed affect
- tenderness to palpation across her trapezius, upper arms, shoulders, paraspinous muscles, bursa, thighs and knees.

AR 383.  In February 2007, plaintiff attended two physical therapy sessions.  She cancelled her next appointment without rescheduling.  AR 361-62.  Plaintiff reported to Stevens on March 6, 2007 that her pain was stable, she was not participating in physical therapy and had refused psychotherapy.  Stevens noted that plaintiff had several excuses for not participating in psychotherapy.  AR 372.


8. Dr. Joseph Tannous

On April 11, 2007, plaintiff saw Dr. Joseph Tannous, who found that plaintiff's dose of methadone had been lowered inadvertently and that her pain was worse.  On examination, he found that plaintiff had

- some neck stiffness
- local tenderness with decreased range of motion of the cervical spine because of spasms and pain
- no significant neurological problems
- fair thought content and judgment
- "seemed a little depressed"

10

Tannous noted that plaintiff found taking antidepressants made her feel like a zombie.  He renewed her correct methadone prescription.  AR 370-71.

## C.  Consulting Physicians

### 1. Dr. Lynne E. Johnson

On August 4, 2005, Dr. Lynne E. Johnson performed a mental status evaluation on plaintiff for the state disability agency.  Plaintiff reported that she did not consider herself to be severely depressed.  On examination, Johnson found plaintiff to have

- organized and goal-directed thinking
- dysphoric mood was dysphoric with full range of affect
- ability to complete reverse serial sevens very slowly with two errors
- recall of three out of three unrelated objects after five minutes and again after 30 minutes
- ability to understand, remember and carry out simple instructions
- mild difficulty in sustaining attention and concentration

Johnson concluded that plaintiff had developed a depressive disorder as a reaction to the pain and associated limitations of fibromyalgia.  AR 263-66.  She found that plaintiff's slow thought processes would likely interfere with her ability to carry out work-like mental tasks with reasonable pace.  Johnson concluded that plaintiff would not have difficulty interacting appropriately with co-workers and supervisors but that because of her chronic pain, she had a limited ability to tolerate stress and would have difficulty tolerating work place stressors. AR 266.

11

2. <u>Dr. Gregory H. Salmi</u>

On January 30, 2005, state agency physician Gregory H. Salmi completed a physical

residual functional capacity assessment for plaintiff.  He found that plaintiff had

- neck and back pain
- fibromyalgia
- ability to lift 20 pounds occasionally and 10 pounds frequently
- ability to stand, walk or sit six hours in an eight-hour work day and occasionally climb ramps and stairs, stoop, kneel, crouch and crawl
- no ability to climb ladders, ropes or scaffold
- ability to reach overhead only occasionally with both arms.  AR 267-74.

3. <u>Dr. Dan Larson</u>

On October 12, 2005, state agency physician Dan Larson affirmed Salmi's assessment

of plaintiff.  AR 274.

4. <u>R. Owen Nelson</u>

On October 12, 2005, state agency psychologist R. Owen Nelson completed a

Psychiatric Review Technique Form for plaintiff and found at AR 280-93 that plaintiff had

- affective disorder
- moderate difficulties in the activities of daily living and in maintaining social functioning
- mild difficulties in maintaining concentration, persistence or pace
- no episodes of decompensation
- no evidence for presence of the "C" criteria

12

- no history of mental health treatment or hospitalization
- refusal to take anti-depressants because of side-effects

Nelson also completed a mental residual functional capacity assessment for plaintiff,

finding her moderately limited in the following areas:

- ability to understand, remember and carry out detailed instructions
- ability to perform activities within a schedule
- ability to maintain regular attendance and be punctual within customary tolerances
- ability to work in coordination with or proximity to others without being distracted by them
- ability to complete a normal work day and work week without interruptions from psychologically based symptoms
- ability to perform at a consistent pace without an unreasonable number and length of rest periods
- ability to interact appropriately with the general public.
- somewhat reduced ability to handle stress and pressure in the work place
- ability to tolerate stresses of a routine, repetitive, three to four step or limited detail work setting

AR 276-79.

## D.  Hearing Testimony

### 1. Plaintiff's testimony

Plaintiff testified that she had not been able to work since November 15, 2004

because of severe pain and concentration and memory problems.  She testified that she could

sit for five or ten minutes at a time, stand for a minute at a time and walk about 100 yards,

could not raise her arms above shoulder height and that she dropped things all the time. She also testified that she was not able to sleep. AR 440-42, 449.

Plaintiff said she could drive, feed herself, brush her teeth and use her fingers to button buttons and zip zippers independently. AR 445-46. She stated that she had problems with concentration and maintaining attention. She testified that although she could bake a frozen pizza, she sometimes forgot it was in the oven and burned it. AR 447. She said that driving long distances made her feel "spacey," forcing her to pull over and stop. AR 448.

Plaintiff testified that she and her husband had lived in Utah for six months. She found the drive to Utah difficult, forcing her to change positions frequently and stop often, AR 449-51, but that when she was there, her fibromyalgia was somewhat better, AR 452, and she never received any medical treatment and took only over-the counter medications because she did not have medical insurance and could not afford treatment. AR 461.

Plaintiff testified that she had taken methadone for pain for four years but that her doctor had changed her recently to morphine, which took the edge off the pain but made her very tired. AR 454-55. She testified that her pain prevented her from getting out of bed two or three days a week. AR 456.

14

Plaintiff testified that she drove to the grocery store and her daughter's house, did laundry and unloaded the dishwasher. AR 458-59. She testified that she was not able to care for her grandchildren. AR 460.

2. Testimony of neutral medical expert

The administrative law judge called Dr. Andrew Steiner, a specialist in physical medicine and rehabilitation, to testify as a neutral medical expert. AR 465. Steiner described plaintiff's pain as primarily attributable to fibromyalgia and not to degenerative changes in the spine and said that in his opinion, it did not meet a listed impairment. AR 468. Steiner found no objective evidence in the record supporting plaintiff's testimony about experiencing problems with reaching, gripping, grasping and holding items. It is his belief that plaintiff would be limited to light work with occasional overhead work and no limitations on the use of her hands. AR 469.

On cross examination, Steiner testified that cervical problems could cause problems with plaintiff's use of her hands and arms but that none of plaintiff's doctors had made that clinical correlation. AR 470. He said that doctors prescribe methadone liberally for pain of all sorts, id. and generally prescribe morphine for malignant pain and not for fibromyalgia. AR 471.

15

3. <u>Testimony of neutral vocational expert</u>

Edward J. Utities testified as a neutral vocational expert.  AR 473.  The administrative law judge asked Utities to assume a hypothetical individual of plaintiff's age education and work experience with fibromyalgia; degenerative changes in the cervical, thoracic and lumbar spine; history of migraine headaches; depression and chronic pain syndrome, who would be limited to light work with occasional overhead activities.  He added that the individual would be limited to routine, repetitive, three to four step unskilled work.  Utities testified that the individual could not perform plaintiff's past work but could perform 8,000 wrapping and packing jobs in Minnesota.  He said that these were unskilled light jobs with only minimal overhead work and would fall within the three to four-step criteria.  AR 474-75.

The administrative law judge added an additional limitation:  the individual would not be able to use her hands on a sustained basis.  In that case, Utities said, the individual would probably not be able to perform gainful work.  He added that for the jobs he cited, "the person would have to be able to use their hands for reaching and handling on a frequent basis."  When the administrative law judge added another limitation— that the individual would not be able to work one or two days a week—Utities said that no employers would tolerate that limitation.  Next, the administrative law judge added the limitation of the inability to remember three or four-step tasks.  Utities testified that the individual could not perform competitive employment.  Utities told the administrative law judge, in response to

16

a question that the information he had provided concerning the jobs was consistent with the descriptions of the jobs in the Dictionary of Occupational Titles.  AR 476.

### 4. Testimony of plaintiff's husband

Kent Goble, plaintiff's husband, testified that plaintiff's condition had gotten worse in the preceding two years.  He said that plaintiff forgot things, dropped things and had  has difficulty staying on task.  AR 479-80.

### D.  The Administrative Law Judge's Decision

In reaching the conclusion that plaintiff was not disabled, the administrative law judge performed the required five-step sequential analysis.  20 C.F.R. § 404.1520.  At step one, she found that plaintiff had not engaged in substantial gainful activity since November 15, 2004.  At step two, she found that plaintiff had severe impairments of fibromyalgia or myofascial pain, degenerative disc disease of the cervical, thoracic and lumbar spine, migraine headaches, depression and chronic pain syndrome.  AR 15.

Relying on the testimony of Dr. Steiner, the administrative law judge found at step three that plaintiff did not have either a physical impairment or combination of impairments or medically determinable mental impairments that met or medically equaled any

17

impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.   AR 16-17.   The administrative law judge determined that plaintiff retained the residual functional capacity to perform unskilled, light work that required lifting 20 pounds occasionally and ten pounds frequently and standing or walking six hours and sitting two hours in an eight-hour work day with no more than occasional overhead work on the right.   She limited the work to routine, repetitive three to four-step unskilled work.   AR 18.   In determining plaintiff's residual functional capacity, the administrative law judge found that plaintiff's statements regarding the intensity, duration and limiting effect of her symptoms were not entirely credible.   AR 19.

Relying on the testimony of the vocational expert, the administrative law judge found that plaintiff could not perform her past work but that she was not disabled because she had the ability to perform one of the 8,000 wrapping and packaging jobs existing in Wisconsin. The administrative law judge found that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles.   AR 26.

OPINION

A.   Standard of Review

The standard by which a federal court reviews a final decision by the commissioner is well settled:   the commissioner's findings of fact are "conclusive" so long as they are

18

supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, reweigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge regarding what the outcome should be. Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the commissioner. Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993). Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, id., and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review." Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002). When the administrative law judge denies benefits, she must build a logical and accurate bridge from the evidence to her conclusion. Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

### B.  Credibility

Under Social Security Ruling 96-7p, an administrative law judge must follow a two-step process in evaluating an individual's own description of his or her impairments:  1)

determine whether an "underlying medically determinable physical or mental impairment" could reasonably be expected to produce the individual's pain or other symptoms; and, if such a determination is made, (2) evaluate the "intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  Social Security Ruling 96-7p, 1996 WL 374186, *1 (1996); see also Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004).  When conducting this evaluation, the administrative law judge may not reject the claimant's statements regarding her symptoms on the sole ground that the statements are not substantiated by objective medical evidence.  Instead, the administrative law judge must consider the entire case record to determine whether the individual's statements are credible. Relevant factors the administrative law judge must evaluate are the individual's daily activities; the location, duration, frequency and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; other treatment or measures taken for relief of pain; the individual's prior work record and efforts to work; and any other factors concerning the individual's functional limitations and restrictions.  SSR 96-7p; 20 C.F.R. § 404.1529(c).  See also Scheck, 357 F.3d at 703; Zurawski, 245 F.3d at 887.

An administrative law judge's credibility determination is given special deference because the administrative law judge is in the best position to see and hear the witness and to determine credibility.  Shramek v. Apfel, 226 F.3d 809, 812 (7th Cir. 2000).  In general, the court will uphold an administrative law judge's credibility determination unless it is "patently wrong."  Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006); Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir. 2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying.").   In doing so, however, the court reviews the administrative law judge's conclusion to see whether it is a logical and reasonable conclusion in light of the facts of the case.  The court will affirm a credibility determination as long as the administrative law judge gives specific reasons that are supported by the record.  Skarbeck v. Barnhart, 390 F. 3d 500, 505 (7th Cir. 2004).

In finding little support in the medical record that fibromyalgia, chronic pain syndrome and depression caused plaintiff's disabling symptoms, the administrative law judge emphasized the inconsistencies between plaintiff's reports of disabling pain, fatigue and inability to concentrate and the findings and observations of her treating physicians.  She cited Iwu's 2006 and 2007 progress notes describing plaintiff as alert, well-oriented and in no acute distress, even though plaintiff was reporting high pain levels at those times, and his 2006, report that plaintiff's pain and pain control were "pretty stable."

21

Although plaintiff reported varying successes with pain management, her case is not one in which seemingly inconsistent notes are a reflection of the particular nature of the disorder. <u>Bauer v. Astrue</u>, 532 F.3d 606, 609 (7th Cir. 2008)) (court cautioned that internal inconsistencies in medical evidence should not automatically be discounted because inconsistencies may be reflective of episodic nature of disorder); <u>see also</u> <u>Winston v. Astrue</u>, 2009 WL 500542, *6 (N.D. Ind. Feb. 26, 2009) (noting episodic nature of bipolar disorder and erratic responses to treatment ) (citing <u>Bauer</u>, 532 F.3d at 608-09).  Hadland observed in April 2005, February 2006 and September 2006 that plaintiff's pain, pain tolerance and fibromyalgia were stable and had remained relatively unchanged.  Iwu's observations of plaintiff are in direct conflict with her contemporaneous complaints of being in intolerable pain and having significant difficulty concentrating.  Other medical evidence of record is consistent with Iwu's observations.

With respect to plaintiff's reported fatigue and inability to concentrate, the administrative law judge pointed out that no physician observed that plaintiff had disabling fatigue and that plaintiff had not undergone regular treatment for her depression.  She noted that the doctors mentioned plaintiff's depression only intermittently and that plaintiff had told physicians that she was not severely depressed.  The administrative law judge found that plaintiff did not report disabling depression after she discontinued Cymbalta.  Her physicians did not recommend additional treatment, except for psychotherapy, which plaintiff refused.

22

In addition to the objective medical evidence, the administrative law judge considered the other relevant factors in determining that plaintiff's testimony concerning her pain and limitations was not entirely credible.  Plaintiff had not participated in a recommended exercise program for fibromyalgia and was not compliant with physical therapy recommended in 2007.  The record shows that plaintiff attended only two physical therapy sessions before cancelling treatment and not rescheduling.  Although the therapist's notes indicate that it was painful for plaintiff to perform exercises, the therapist noted that plaintiff's reason for discharge was "attendance and participation not sufficient to achieve goals" and "cancelled appointment/did not reschedule & unable to be contacted."  AR 362. It was not unreasonable for the administrative law judge to give little weight to plaintiff's argument that she was unable to attend sessions because of pain and similarly tried physical therapy in 2005 but had no success because of her pain.

The administrative law judge pointed out that plaintiff had similar problems with mental health treatment.  Plaintiff did not participate in continuing mental health treatment, often ending it on her own even when it was helpful.  Although plaintiff disputes this finding, the record evidence supports it.  Iwu's 2007 treatment notes show that she refused psychotherapy, and Hadland's 2005 notes indicate that even though Cymbalta improved her mood and reduced her pain, she stopped taking it after only two months because she felt over-medicated.

23

Plaintiff argues that the adjudicator ignored the fact that taking strong medication is supportive of her alleged symptoms by itself.  The record shows that the administrative law judge did not ignore this fact.  Instead, she undertook a thorough review of plaintiff's medications and their side effects.  She observed that although plaintiff used narcotic pain medications, she was able to function without them when she lived in Utah for six months and did much better when she was living there.  The administrative law judge noted plaintiff's request of Hadland in April 2005 to be taken off Cymbalta despite its effectiveness in decreasing her pain and improving her mood.  In May 2005, plaintiff reported to Hadland that her fibromyalgia was worse and asked for continued methadone treatment but on September 28, 2005, she told Hadland she was doing well.  The administrative law judge found no medical evidence that plaintiff suffered side effects from the medication.  It was reasonable for the administrative law judge to conclude from this evidence that although there were times when plaintiff required strong pain medication, the medication kept her pain under control and caused her no additional problems.

The administrative law judge considered plaintiff's daily activities, including the fact that she traveled to Utah, went on short shopping trips, went boating, had lunch or coffee with her friends, drove, handled personal finances and did the laundry.  She concluded that these activities were inconsistent with plaintiff's claims of disabling pain, fatigue and depression and that her plaintiff's ability to brush her teeth, button and zip independently,

24

put on eye make up and use a microwave were inconsistent with her claims that she could not use her hands because of numbness.  Despite the limitations on plaintiff's activities, the administrative law judge could reasonably conclude that the alleged severity of pain was inconsistent with the activities that plaintiff was able to perform.

Finally, the administrative law judge considered the fact that plaintiff had worked after being diagnosed with fibromyalgia and degenerative disc disease and that there was no medical evidence that her condition had become significantly worse after she stopped working.  The administrative law judge did err in stating that plaintiff never tried less than medium level work even on a part-time basis.  In fact, plaintiff had tried working as a teacher's assistant and helping part-time with her husband's business in 2004.  The administrative law judge said that plaintiff lacked a motivation for work but never explained her reasons for this statement.  In these respects, the administrative law judge's assessment of plaintiff's work history was not entirely correct, but her errors were harmless.

Work history is only one of the several factors that an administrative law judge must consider in evaluating credibility.  In this case, the administrative law judge gave full consideration to the objective medical evidence and several other factors in reaching her credibility determination.  It is possible that she could have reached a different decision, especially with respect to some of the factors, but she did not ignore any evidence or make any significant logical errors.  Thus, I cannot say that her decision was patently wrong.

25

Overall, she built an accurate and logical bridge between the evidence and result and gave good reasons for her determination that are supported by the record.  Plaintiff has not demonstrated that this is one of those rare occasions on which the court should disturb the administrative law judge's credibility finding.

### C.  Residual Functional Capacity

The determination of residual functional capacity is an assessment of what work-related activities a plaintiff can perform despite her limitations. 20 C.F.R. § 404.1545(a)(1). It must be based on all of the relevant evidence in the record.  Id.  The administrative law judge determined that plaintiff had the physical residual functional capacity to perform light work with no more that occasional overhead work on the right and that plaintiff had the mental residual functional capacity to perform routine repetitive three to four step unskilled work.  Plaintiff raises a number of objections to this aspect of the administrative law judge's decision.

### 1.  Opinions of treating physician

Although an administrative law judge must consider all medical opinions of record, she is not bound by those opinions.  Haynes v. Barnhart, 416 F.3d 621, 630 (7th Cir. 2005). "[T]he weight properly to be given to testimony or other evidence of a treating physician

26

depends on circumstances." Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006). When a treating physician's opinion is well supported and no evidence exists to contradict it, the administrative law judge has no basis on which to refuse to accept the opinion. Id.; 20 C.F.R. § 404.1527(d)(2). When, however, the record contains well supported contradictory evidence, the treating physician's opinion "is just one more piece of evidence for the administrative law judge to weigh," taking into consideration the various factors listed in the regulation. Id. These factors include the number of times the treating physician has examined the claimant, whether the physician is a specialist in the allegedly disabling condition and how consistent the physician's opinion is with the evidence as a whole. 20 C.F.R. § 404.1527(d)(2). An administrative law judge must provide "good reasons" for the weight she gives a treating source opinion, id., and must base her decision on substantial evidence and not mere speculation. White v. Apfel, 167 F.3d 369, 375 (7th Cir. 1999).

Plaintiff asserts correctly that a contradictory opinion of a non-examining physician is not sufficient by itself to provide the evidence necessary to reject a treating physician's opinion. Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003). By rejecting a treating physician's opinion only because a non-examining physician has expressed a contrary opinion, the administrative law judge is effectively substituting her judgment for that of the treating physician. This is impermissible.

27

In determining plaintiff's residual functional capacity, the administrative law judge gave Steiner's opinion the greatest weight, finding that it was supported by the overall evidence and consistent with the state agency physician's opinion that plaintiff could perform light work.  She did not give much weight to the state agency physician's opinion that plaintiff had limited ability to climb, stoop, kneel, crouch, crawl or reach overhead because she found that he did not have the opportunity to review the later medical evidence or hear plaintiff's testimony.

The administrative law judge found that Hadland and Iwu had relied on plaintiff's subjective complaints of pain and limitations, which were not well supported by the objective medical evidence.  The administrative law judge noted that most of the medical evidence predated plaintiff's alleged onset date and the later evidence showed no worsening of plaintiff's condition.  She found that the doctors' treatment notes indicated that plaintiff was in no acute distress, alert, oriented and pleasant and did not support plaintiff's complaints of disabling pain.  The administrative law judge also noted that other evidence was inconsistent with an opinion that plaintiff was unable to work, particularly the evidence that plaintiff had been able to work at one time despite her fibromyalgia and that the fibromyalgia had not worsened significantly, according to Hadland's notes, as well as plaintiff's failure to comply with recommended therapy or exercise sessions that might have improved her functioning.

28

The administrative law judge provided good reasons, supported by substantial evidence in the record, for not giving controlling weight to the opinions of Hadland and Iwu. Hofslien, 439 F. 3d at 377 (administrative law judge determines how much weight to give various medical opinions and court will uphold that decision if it is supported by substantial evidence). The administrative law judge did not reject the opinions of plaintiff's treating physicians solely on the basis of Steiner's opinion but considered other evidence in the record. It is well settled that an administrative law judge may disregard a medical opinion premised on the claimant's self-reported symptoms if the administrative law judge has reason to doubt the claimant's credibility. Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995) (administrative law judge could reject portion of physician's report based upon plaintiff's own statements of functional restrictions if administrative law judge finds plaintiff's subjective statements not credible); Mastro v. Apfel, 270 F.3d 171, 177-78 (4th Cir. 2001) (affirming administrative law judge's disregard of treating physician's opinion because opinion "was based largely upon claimant's self-reported symptoms" and not supported by objective medical evidence); Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 602 (9th Cir. 1999) (physician's opinion of disability premised to large extent on claimant's own accounts of symptoms and limitations may be disregarded where those complaints have been properly discounted). Because the administrative law judge had

29

adequate grounds for discounting plaintiff's subjective statements as not credible, it follows that she could reject any opinions that were based on those statements.

2. <u>Failure to consider fibromyalgia</u>

Essentially repeating her arguments regarding the credibility determination, plaintiff argues that the administrative law judge made "short shrift" of plaintiff's pain because she did not have loss of motion, weakness or poor neurological functioning. As plaintiff points out, a complaint of fibromyalgia cannot be dismissed for lack of objective medical evidence because its symptoms are subjective. <u>Sarchet v. Chater</u>, 78 F. 3d 305, 306-08 (7th Cir. 1996). However, it takes more than a mere diagnosis of fibromyalgia to establish that an individual can or cannot perform a certain exertional level of work.

It is clear from the medical evidence that plaintiff had a severe impairment caused by fibromyalgia. However, the administrative law judge found the impairment not so limiting as to affect plaintiff's ability to perform light work with only occasional overhead work on the right. The only evidence that plaintiff's pain from fibromyalgia interfered with her ability to do light work was plaintiff's testimony and the opinions of her treating physicians, all of which the administrative law judge found unpersuasive. As previously discussed, the findings of the administrative law judge were reasonable.

30

Plaintiff objects to the administrative law judge's reliance on the disability report in which plaintiff stated that she could lift 20 pounds. She argues that the reliance is unfair because the administrative law judge ignored all of the descriptions of pain contained in the report. As I have said, however, the administrative law judge thoroughly considered plaintiff's self-reported symptoms, including her testimony and statements to her treating physicians. Just as plaintiff's reports of pain are relevant, so is her statement that she could lift 20 pounds. The administrative law judge did not err in considering this report, which is consistent with her finding that plaintiff could lift ten pounds frequently and 20 pounds occasionally.

3. Hand and arm limitations

Plaintiff takes issue with the administrative law judge's failure to consider Kioski's treatment note that she had radiating pain into her arms; Perra's note that she had pain in her right arm, a decreased grip and a tendency to drop things; and Perra's statement that her discs had worn out and she had few options. She fails to say that these treatment notes were from 2003, before her alleged onset date, and predominantly reflect plaintiff's self reports.

With respect to plaintiff's degenerative disc disease, the administrative law judge noted that tests showed only mild degeneration in 2002 and thereafter showed repeatedly that plaintiff suffered few neurological effects or loss of strength or range of motion. The

31

medical reports showed that plaintiff had normal upper extremity strength, grip and finger spreading.   Koski noted that plaintiff's electromyogram indicated normal upper right extremity strength.  The administrative law judge noted that although the medical expert had agreed that cervical problems could cause hand problems, Steiner testified that none of plaintiff's physicians had linked plaintiff's reported arm and hand problems to her degenerative disc disease or assessed any associated limitations.   The administrative law judge noted that this opinion was consistent with Tierney's 2005 note that plaintiff's pain was not compatible with her degenerative disc disease and osteoarthritis, and Iwu's April 2007 opinion that plaintiff's symptoms resulted primarily from her fibromyalgia.   It is evident that the administrative law judge thoroughly reviewed the record and reached a well-founded conclusion.

4.  Mental residual functional capacity

       With respect to mental residual functional capacity, a person must be able to perform the following mental activities in order to perform competitive, unskilled work:  understand, remember and carry out simple instructions; make judgments that are commensurate with the functions of unskilled work; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting.   20 C.F.R. § 404.1545(a)(2); Soc. Sec. Ruling 96-9p.

The administrative law judge considered the January 2005 opinion prepared by consulting psychologist Johnson and accepted Johnson's findings on plaintiff's slowed thought process. Although plaintiff disputes this, it is clear from the residual functional capacity finding that the administrative law judge framed at the hearing, limiting plaintiff to simple, unskilled work.

Plaintiff is correct that the administrative law judge gave no weight to Johnson's finding that plaintiff would be very limited in her ability to tolerate stress. However, as the adjudicator noted, Johnson attributed this limitation to plaintiff's pain rather than her mental impairment. The administrative law judge reasoned that Johnson's opinion on this point was not persuasive in light of her own findings that plaintiff's allegations of pain and fatigue were not fully credible. She also noted that state agency psychologist Nelson had found in October 2005 that although plaintiff's ability to handle stress and pressure in the workplace would be somewhat reduced, she would be able to tolerate the stress of a routine, repetitive, three to four-step or limited detail work setting. The administrative law judge did not err in evaluating Johnson's opinion. It was reasonable for her to conclude that plaintiff had mental residual function capacity to perform unskilled work.

One issue should be cleared up. Plaintiff contends that the administrative law judge erred in limiting plaintiff to simple unskilled work and then including "step three and four work" in the residual functional capacity finding. Plaintiff confuses the reference to "three

33

to four-step work" by the administrative law judge with the skill levels of work listed in the <u>Dictionary of Occupational Titles</u>, which has a specific SVP ("specific vocational preparation" time) for each occupation.  Social Security Ruling 00–4p.  Using the skill level definitions listed in the regulations, unskilled work corresponds to an SVP of one to two and semi-skilled work to an SVP of three to four in the <u>Dictionary</u>.  The administrative law judge was discussing three to four- <u>step</u> work, not the skill level listed in the <u>Dictionary</u>.  Unskilled work that requires "no more than three or four steps" is not "work with an SVP of three or four."  Nothing in the record suggests that the administrative law judge thought that plaintiff could perform anything but unskilled work.  The vocational expert identified jobs that were routine, repetitive, three to four-step unskilled work and ruled out her past work because it was semi-skilled.  Therefore, the administrative law judge did not err in determining that plaintiff could perform "three to four-step unskilled work."

### D.  <u>Step Five</u>

Only those limitations supported by medical evidence in the record need be incorporated into the residual functional capacity finding and the hypothetical posed to the vocational expert.  <u>Young v. Barnhart</u>, 362 F.3d 995, 1001-02 (7th Cir. 2004); <u>Steele</u>, 290 F.3d at 942.  It was not necessary, as plaintiff contends, to include in the hypothetical her inability to maintain a normal pace, when the record does not support this alleged limitation.

34

The administrative law judge can meet her burden at step five by relying on information contained in the <u>Dictionary of Occupational Titles</u>, which is published by the Department of Labor and gives detailed physical requirements for a variety of jobs.  SSR 00-4p; <u>see also</u> 20 C.F.R. §§ 404.1566(d)(1) and 416.966(d)(1) (Social Security Administration has taken administrative notice of <u>Dictionary</u>).  Alternatively, the administrative law judge can rely on testimony from the vocational expert.  20 C.F.R. §§ 404.1366(e) and 416.966(e); SSR 00-4p.  When, as in this case, an administrative law judge takes testimony from a vocational expert about the requirements of a particular job, SSR 00-4p requires her to ask whether that testimony conflicts with the <u>Dictionary</u>.  If there is an *apparent* unresolved conflict, the administrative law judge must obtain a reasonable explanation from the expert for the conflict.  20 C.F.R. §§ 404.1366(e) and 416.966(e); SSR 00-4p; <u>Overman v. Astrue</u>, 546 F. 3d 456, 463 (7th Cir. 2008); <u>Prochaska</u>, 454 F.3d at 735.  Although plaintiff concedes that the administrative law judge asked the vocational expert whether his testimony conflicted with the <u>Dictionary</u>, she asserts that the adjudicator should have made further inquiries because there were apparent conflicts in his testimony.

The administrative law judge found that plaintiff could perform occasional overhead work on the right and posed a hypothetical including this limitation.  In response, the expert testified that there were about 8,000 wrapper and packer jobs (including bander, wrapping machine operator, garment folder and polypacker and heat sealer) that required only

35

minimal overhead work, if any.  He testified that a person could not perform these jobs if she was unable to use her hands on a consistent basis because "the person would have to be able to use their hands for reaching and handling on a frequent basis." AR 476.  The expert testified that his testimony was consistent with the Dictionary.  Plaintiff's counsel did not cross examine him about reaching or overhead work.

In cases like this one, in which plaintiff failed to identify a conflict at the time of the hearing, plaintiff must show that "the conflicts were obvious enough that the ALJ should have picked up on them without any assistance."  Overman, 546 F.3d at 463.  In support of her argument that there is an obvious conflict between her overhead work limitation and the frequent reaching requirement of he jobs identified by the vocational expert, plaintiff points out that in Prochaska, 454 F.3d at 736, the Court of Appeals for the Seventh Circuit found that reaching requirements in the Dictionary do not distinguish reaching above shoulder level from other types of reaching.  This is correct, but plaintiff never brought it tp the administrative law judge's attention at the hearing.  Before testifying that the wrapper and packer jobs required frequent reaching, the expert had testified that none of those jobs required no more than minimal overhead work, if any.  In light of these statements, the administrative law judge was entitled to rely on the expert's testimony that his opinion did not conflict with the Dictionary.

SSR 00-4p reasonably allows administrative law judges to assume that a vocational expert who testifies under oath that his testimony is consistent with the <u>Dictionary</u> is telling the truth, requiring further inquiry only if the expert says that her testimony is *not* consistent with the <u>Dictionary</u> or if the conflict is so obvious as to alert the administrative law judge. At least in instances in which the claimant is represented by a lawyer, there is little that is unfair about this procedure. In spite of the non-adversarial nature of social security hearings, it remains the case that a vocational expert is "free to give a bottom line, provided that the underlying data and reasoning are available on demand." <u>Donahue v. Barnhart</u>, 279 F.3d 441, 446 (7th Cir. 2002). A lawyer who wants to cross-check job requirements cited by a vocational expert against the descriptions set forth in the <u>Dictionary</u> is free to ask the expert to provide the relevant <u>Dictionary</u> citations. Further, a lawyer who does not have adequate time to consult with the <u>Dictionary</u> on the spot can ask for a brief recess or for time to supplement the record after the hearing. <u>Britton v. Astrue</u>, 521 F.3d 799, 804 (7th Cir. 2008) (suggesting ways to balance "the needs of the claimant to effectively cross-examine the VE and the needs of the Commissioner to hold efficient hearings").

In sum, because there was no obvious conflict between the expert's testimony and the <u>Dictionary</u>, the administrative law judge did not have any affirmative duty to make further inquiries of the expert. I am satisfied that the administrative law judge met her responsibility under SSR 00-4p and properly relied on the vocational expert's testimony.

37

ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of

Social Security, is AFFIRMED and plaintiff Annette Goble's appeal is DISMISSED.  The

clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 22nd day of May, 2009.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge